1  PILLSBURY WINTHROP SHAW PITTMAN LLP
2  Claire K. Wu (SBN 295966)
   725 South Figueroa Street, 36th Floor
3  Los Angeles, CA 90017
   Telephone:   213-488-3655
4  Facsimile:    213-629-1033
5
6  Eric Fishman (*Pro Hac Vice*)
   Andrew M. Troop (*Pro Hac Vice*)
7  Carolina A. Fornos (*Pro Hac Vice*)
   31 West 52nd Street
8  New York, NY 10019
   Telephone:   212-858-1000
9  Facsimile:    212-858-1500
10
11 *Attorneys for Bombardier Aerospace Corporation,*
   *Bombardier Inc., and Learjet, Inc.*
12
13              **UNITED STATES DISTRICT COURT**
14          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
15

| | |
|---|---|
| In re:<br><br>ZETTA JET USA, INC., a California corporation,<br><br>          Debtor. | Case No. 2:22-cv-6637-JAK<br>Case No. 2:22-cv-2004-JAK<br><br>On Appeal to the U.S. District Court from the U.S. Bankruptcy Court, Central District of California Bankruptcy Case No. 2:17-bk-21386-SK and Adversary Case Nos. 2:19-ap-01382-SK, 2:19-ap-01147-SK |
| In re:<br><br>ZETTA JET PTE, LTD., a Singaporean corporation,<br><br>          Debtor. | |
| JONATHAN D. KING, solely in his capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd.,<br><br>          Plaintiff,<br><br>     v.<br><br>JETCRAFT CORPORATION, JETCRAFT GLOBAL, INC., JETCOAST 5000-5 LLC, ORION AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA LIMITED, FK GROUP LTD, FK PARTNERS LIMITED, JAHID FAZAL-KARIM, BOMBARDIER AEROSPACE CORPORATION, | **DECLARATION OF ANDREW M. TROOP RE PROPOSED REDACTIONS TO THE COURT'S MARCH 26, 2024 MINUTES ORDER AND PERCIPIENT WITNESS DECLARATIONS IN SUPPORT THEREOF** |

1  BOMBARDIER, INC., and LEARJET, INC.,

2       Defendants.

3  _____

JONATHAN D. KING, solely in his capacity
4  as Chapter 7 Trustee of Zetta Jet USA, Inc.
and Zetta Jet PTE, Ltd.,

5

6       Plaintiff,

7    v.

8  CAVIC AVIATION LEASING (IRELAND)
22 CO. DESIGNATED ACTIVITY
9  COMPANY and BOMBARDIER
AEROSPACE CORPORATION,

10       Defendants.

11  _____

12       **<u>DECLARATION OF ANDREW M. TROOP</u>**

13  I, Andrew M. Troop, hereby declare under penalty of perjury as follows:

14       1.    I am a partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP,

15  and counsel for Bombardier Aerospace Corporation, Bombardier Inc. and Learjet, Inc.

16  in the above-captioned matter.

17       2.    I am over the age of 18 and have personal knowledge of the facts set forth

18  below and, if called upon to testify, would and could competently testify to the matters

19  set forth in this declaration.

20       3.    The Court's March 26, 2024 Minutes Order ("March 26 Order") was

21  issued under seal and directed the parties to jointly submit any proposed redactions with

22  a corresponding declaration from a percipient witness as to why the information should

23  not be available on the public docket.  Pursuant to the March 26 Order, attached are the

24  following documents:

25      • **FILED UNDER SEAL - Exhibit A**: ORDER RE BANKRUPTCY APPEALS

26        (21-7572 DKT. 1; 22-2004 DKT. 1; AND 22-6637 DKT. 1) – **REDACTION**

27        **BOXES UNAPPLIED**;

28

                                             1

- **FILED UNDER SEAL - Exhibit B**: ORDER RE BANKRUPTCY APPEALS (21-7572 DKT. 1; 22-2004 DKT. 1; AND 22-6637 DKT. 1) – **REDACTION BOXES APPLIED**;

- **Exhibit C**: DECLARATION OF MERCEDES GLOCKSEISEN IN SUPPORT OF BOMBARDIER'S REQUEST TO FILE UNDER SEAL THE COURT'S MARCH 26, 2024 MINUTES ORDER;

- **Exhibit D**: DECLARATION OF PETER ANTONENKO IN SUPPORT OF REDACTION OF MARCH 26, 2024 APPEAL DECISION AND DECLARATION OF JAHID FAZAL-KARIM IN SUPPORT OF REDACTION OF MARCH 26, 2024 APPEAL DECISION.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 9, 2024          */s/ Andrew M. Troop*

Andrew M. Troop

2

# EXHIBIT A

TO DECLARATION OF ANDREW M. TROOP RE
PROPOSED REDACTIONS TO THE COURT'S
MARCH 26, 2024 MINUTES ORDER AND
PERCIPIENT WITNESS DECLARATIONS IN
SUPPORT THEREOF

**DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

# EXHIBIT B

TO DECLARATION OF ANDREW M. TROOP RE
PROPOSED REDACTIONS TO THE COURT'S
MARCH 26, 2024 MINUTES ORDER AND
PERCIPIENT WITNESS DECLARATIONS IN
SUPPORT THEREOF

**DOCUMENT PROPOSED
TO BE FILED UNDER SEAL**

# EXHIBIT C

TO DECLARATION OF ANDREW M. TROOP RE
PROPOSED REDACTIONS TO THE COURT'S
MARCH 26, 2024 MINUTES ORDER AND
PERCIPIENT WITNESS DECLARATIONS IN
SUPPORT THEREOF

PILLSBURY WINTHROP SHAW PITTMAN LLP
Claire K. Wu (SBN 295966)
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017
Telephone:   213-488-3655
Facsimile:   213-629-1033

Eric Fishman (*Pro Hac Vice*)
Andrew M. Troop (*Pro Hac Vice*)
Carolina A. Fornos (*Pro Hac Vice*)
31 West 52nd Street
New York, NY 10019
Telephone:   212-858-1000
Facsimile:   212-858-1500

*Attorneys for Bombardier Aerospace Corporation,*
*Bombardier Inc., and Learjet, Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>ZETTA JET USA, INC., a California corporation,<br><br>         Debtor. | Case No. 2:22-cv-6637-JAK<br>Case No. 2:22-cv-2004-JAK<br><br>On Appeal to the U.S. District Court from the U.S. Bankruptcy Court, Central District of California Bankruptcy Case No. 2:17-bk-21386-SK and Adversary Case Nos. 2:19-ap-01382-SK, 2:19-ap-01147-SK |
| In re:<br><br>ZETTA JET PTE, LTD., a Singaporean corporation,<br><br>         Debtor. | |
| JONATHAN D. KING, solely in his capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd.,<br><br>         Plaintiff,<br><br>   v.<br><br>JETCRAFT CORPORATION, JETCRAFT GLOBAL, INC., JETCOAST 5000-5 LLC, ORION AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA LIMITED, FK GROUP LTD, FK PARTNERS LIMITED, JAHID FAZAL-KARIM, BOMBARDIER AEROSPACE CORPORATION, | **DECLARATION OF MERCEDES GLOCKSEISEN IN SUPPORT OF BOMBARDIER'S REQUEST TO FILE UNDER SEAL THE COURT'S MARCH 26, 2024 MINUTES ORDER** |

1  BOMBARDIER, INC., and LEARJET, INC.,

2       Defendants.

3  _____

   JONATHAN D. KING, solely in his capacity
4  as Chapter 7 Trustee of Zetta Jet USA, Inc.
   and Zetta Jet PTE, Ltd.,

5       Plaintiff,

6    v.

7  CAVIC AVIATION LEASING (IRELAND)
8  22 CO. DESIGNATED ACTIVITY
   COMPANY and BOMBARDIER
9  AEROSPACE CORPORATION,

10      Defendants.

11 _____

12       **<u>DECLARATION OF MERCEDES GLOCKSEISEN</u>**

13 I, Mercedes Glockseisen, hereby declare under penalty of perjury as follows:

14      1.    I am over 18 years of age.  I currently serve as Vice President, Contracts

15 & Legal Services for Bombardier Inc.  Bombardier Aerospace Corporation, Bombardier

16 Inc. and Learjet, Inc. are collectively referred to herein as "Bombardier."

17      2.    In the course of my current and previous roles at Bombardier, I have been

18 and remain involved in nearly every aspect of Bombardier's business relationships with

19 most of its fleet customers.  This declaration is submitted in support of Bombardier's

20 Request to File Under Seal the Court's March 26, 2024 Minutes Order ("March 26

21 Order").  *See* Case No. 2:22-cv-6637, Dkt. No. 81; Case No. 2:22-cv-2004, Dkt. No.

22 91.  All capitalized terms not defined herein have their meaning as set forth in the March

23 26 Order.

24      3.    As a result of my work with Bombardier, my review of relevant

25 documents, and my discussions with members of Bombardier's management teams, I

26 am familiar with Bombardier's day-to-day operations and business affairs. Except as

27

28

otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

### A.   **Bombardier's Relationship with the Debtors**

4.     Bombardier is one of the largest manufacturers of aircraft in the world, including three families of business aircraft - Learjet, Challenger and Global. Bombardier is a global leader in the design, manufacture, and support of business and specialized aircraft.

5.     Bombardier had a multi-faceted relationship with the pre-petition Debtors. Among other aspects to that relationship, Bombardier and the Debtors entered into purchase agreements for Bombardier aircraft or with others for aircraft that ultimately ended up in the Debtors' fleet.  Bombardier entities also provided warranty and non-warranty service and repairs to the Bombardier aircraft in the Debtors' fleet, which included both Global 5000 and Global 6000 aircraft as well as a Challenger 650 aircraft.

### B.   **The March 26 Order Contains Highly Confidential Information**

6.     The March 26 Order includes allegations from the Trustee's First Amended Complaint concerning the terms of purchase agreements by and between Bombardier and Zetta Jet PTE, Ltd. and Bombardier and others for the manufacture of Bombardier aircraft, as well as amendments thereto and related transactional documents referring to these agreements and their terms. It is extremely and objectively important to Bombardier that the confidentiality of these agreements be preserved.

7.     The business aircraft manufacturing market is extremely competitive and consists of a limited number of manufacturers that are almost always in direct competition with each other for sales.  There are five main business jet manufacturers: Bombardier, Gulfstream, Textron (including Cessna and Beechcraft), Embraer, and Dassault. Certain manufacturers, like Embraer, also sell commercial aircraft that can be converted to business jets. These manufacturers compete to sell business jets to a small universe, consisting largely of business entities or extremely wealthy individuals with the earning power to purchase jets which can cost in excess of $50 million.

8.      Potential purchasers of business jets are very sophisticated in commercial matters and are often advised by counsel, brokers and other advisors that review court filings and other publicly available documents for information that may afford such purchasers a competitive advantage in negotiating the terms governing the purchase and sale of a business aircraft.

9.      Business aircraft manufacturers compete for business based not only on publicly available information about the attributes and performance of their respective offerings, but also on extensively negotiated and otherwise confidential terms and conditions governing the sale of the aircraft to the customer, including, of course, the economics of the transaction.

10.     The key terms that can vary from transaction to transaction, or between and amongst manufacturers, include, among others: (a) the price of the aircraft; (b) the payment schedule; (c) termination; (d) remedies, including liquidated damages, in the event of termination; (e) the entities to which a purchase and sale contract may (and may not) be assigned; and (f) commissions to sales representatives.

11.     It is essential that the terms and conditions, including the economic ones, governing a purchase transaction remain strictly confidential for, at least, two reasons. First, if these contractually confidential terms and conditions were publicly available, they would place Bombardier at a decided disadvantage in negotiating transactions with prospective purchasers. As noted, purchasers of multi-million-dollar aircraft are extremely sophisticated commercial parties, very likely to find publicly disclosed pricing and other economic and commercial terms, conditions and data and to use that information in negotiations. Second, disclosure would also directly benefit competing aircraft manufacturers, who would then be able to use such information in trying to put together an aircraft offering more attractive than that which Bombardier was otherwise prepared to offer.

12.     For these reasons, Bombardier invariably includes strict confidentiality provisions or confidential designations in its aircraft purchase agreements, completion

3

specifications, letters of intent, representative agreements, other related agreements, and drafts thereof, to prevent disclosure to the public, competitors, and other third parties of the terms and conditions contained therein. Thus, the agreements in these transactions contain strict confidentiality provisions.

13.    Further, Bombardier requires all its employees to maintain the confidentiality of its contracts, including purchase agreements and representative agreements, and other proprietary data. Bombardier's Code of Ethics and Business Conduct, which all employees are obligated to follow, states that employees may not "divulge confidential information to anyone other than the person or persons for whom it is intended, . . . ." "Confidential information" is defined to include "legal documents and information on customers. . . ." This confidentiality regime continues to apply even after an employee no longer works for Bombardier.

14.    To ensure confidentiality, purchase and sale contracts, representative agreements and other related agreements are maintained by a limited group in Bombardier's Contracts and Legal Department, and access to those contracts is limited.

15.    In the context of lawsuits arising out of purchase and sale contracts, representative agreements and other related agreements, or drafts thereof, Bombardier invariably requests to protect its confidential information by seeking an appropriate sealing order.

16.    In this particular case, the risk of public disclosure, and the attendant harm, is heightened by the fact that the Debtors' bankruptcies, and the appeals therefrom, have drawn significant attention from both current and potential buyers and sellers of business aircraft, as well as industry media. I review aircraft industry media on a regular basis and much has been written about the Zetta Jet bankruptcies with the result that most everyone who sells or buys business aircraft is aware of the Zetta Jet bankruptcies. It is beyond doubt that, if the proposed redactions to the March 26 Order are not sealed, this confidential commercial information will become public knowledge.

17.    Bombardier has limited the redactions to the minimum necessary in the

March 26 Order to information relating to pricing, payment schedules, sales commissions, and key competitive contractual terms, all of which have previously been authorized to be redacted in connection with the related underlying adversary proceedings. The requested redactions in the March 26 Order are summarized in Exhibit A to this declaration, along with the reasons for the redactions. Allowing disclosure of the proposed redactions virtually guarantees the information will get to Bombardier's customers and competitors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 9, 2024                          _____

Mercedes Glockseisen

5

## EXHIBIT A

## BOMBARDIER'S PROPOSED REDACTIONS AND REASONS FOR REDACTIONS

| No. | Proposed Redactions | Reasons for Redactions |
|---|---|---|
| 1 | Page 12 | This contains highly confidential commercial information relating to: (b) the payment schedule; (c) termination; and (d) remedies, including liquidated damages, in the event of termination. *See* Declaration of Mercedes Glockseisen, dated April 9, 2024 ¶ 10. |
| 2 | Page 14 | This contains highly confidential commercial information relating to: (b) the payment schedule; (c) termination; and (d) remedies, including liquidated damages, in the event of termination. *Id.* |
| 3 | Page 15 | This contains highly confidential commercial information relating to: (b) the payment schedule; (c) termination; (d) remedies, including liquidated damages, in the event of termination; (e) the entities to which a purchase and sale contract may (and may not) be assigned; and (f) commissions to sales representatives. *Id.* |
| 4 | Page 17 | This contains highly confidential commercial information relating to: (a) the price of the aircraft; and (d) remedies, including liquidated damages, in the event of termination. *Id.* |
| 5 | Page 18 | This contains highly confidential commercial information relating to: (f) commissions to sales representatives. *Id.* |
| 6 | Page 19 | This contains highly confidential commercial information relating to: (b) the payment schedule; (d) remedies, including liquidated damages, in the event of termination; and (f) commissions to sales representatives. *Id.* |
| 7 | Page 24 | This contains highly confidential commercial information relating to: (f) commissions to sales representatives. *Id.* |
| 8 | Page 27 | This contains highly confidential commercial information relating to: (a) the price of the aircraft; and (f) commissions to sales representatives. *Id.* |
| 9 | Page 28 | This contains highly confidential commercial information relating to: (a) the price of the aircraft. *Id.* |
| 10 | Page 58 | This contains highly confidential commercial information relating to: (e) the entities to which a purchase and sale contract may (and may not) be assigned. *Id.* |

# EXHIBIT D-1

TO DECLARATION OF ANDREW M. TROOP RE
PROPOSED REDACTIONS TO THE COURT'S
MARCH 26, 2024 MINUTES ORDER AND
PERCIPIENT WITNESS DECLARATIONS IN
SUPPORT THEREOF

KING & SPALDING LLP
Aaron Craig (Cal. Bar. No. 204741)
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Telephone: 213.443.4355

Michael Ciatti (admitted pro hac vice)
1700 Pennsylvania Ave., NW
2nd Floor
Washington, D.C. 20006-4707
Telephone: 202.737.0500

*Attorneys for Jetcraft Corporation, Jetcraft Global, Inc., Jetcoast 5000-5 LLC, Orion Aircraft Holdings Ltd., FK Group Ltd., FK Partners Limited and Jahid Fazal-Karim*

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| IN RE:<br><br>ZETTA JET USA, INC., et al. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK<br><br><br>**DECLARATION OF PETER ANTONENKO IN SUPPORT OF REDACTION OF MARCH 26, 2024 APPEAL DECISION** |

I, Peter Antonenko, hereby declare under penalty of perjury as follows:

1.      I am over 18 years of age.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.   This declaration is submitted in support of the redaction of certain information from the Court's March 26, 2004 Order Re Bankruptcy Appeals (21-7572 DKT. 1; 22-2004 DKT. 1; and 22-6637 DKT. 1) (the "Appeal Decision"). I currently serve as the President of Jetcraft Corporation and am a minority shareholder and board member of Jetcraft Global (UK) Limited (collectively, "Jetcraft").  I have served in this role since 2014, and previously served as the Executive Vice President, Senior Vice President and General Counsel, and Vice President of Operations at different times since I joined Jetcraft in 2006.  Currently, Jetcraft has approximately 50 employees.

2.      Jetcraft is in the business of aircraft sales, acquisition, leasing, and related services, and it was in existence for approximately 40 years before I joined Jetcraft in 2006.  In the course of my roles, I have been and remain involved in Jetcraft's operations, and I currently oversee Jetcraft's marketing, legal, and transactional management groups, including in-house counsel, who have responsibility for day-to-day operations.  More specifically, I have been and am involved with negotiating and documenting Jetcraft's aircraft purchase and sale transactions, including financing aspects of those deals, in the private aircraft market.  Jetcraft's counterparties on the purchase and sale transactions include original aircraft manufacturers, corporations, sovereigns, and individuals.  I have significant experience negotiating with these purchasers and sellers, as well as with maintenance providers, vendors, advisors, consultants, and attorneys for each.

3.      As explained herein, the material from the Appeal Decision described below constitutes confidential commercial information. Public disclosure of such information creates a significant risk of harm for Jetcraft's business and should, therefore, be redacted from the publicly-filed version of the Appeal Decision.

1

4.     Jetcraft is a market leader in the business of buying and selling private aircraft.  Jetcraft generates a portion of its revenue by acquiring new or pre-owned aircraft and then ultimately reselling or trading those aircraft to third parties. In addition, Jetcraft earns brokerage fees when it matches aircraft buyers and sellers and facilitates their transactions. Jetcraft's profitability is a product of the margins and fees it earns on aircraft transactions and the expenses, financing costs, and commissions it incurs to complete such transactions.

5.     Given the capital-intensive nature of private aircraft transactions, with prices that can often exceed $50 million, the market in which Jetcraft operates is highly competitive and consists of a limited number of participants competing with one another for sales to a relatively small group of global clienteles.  The parties involved in these transactions, and their advisors, are highly sophisticated and seek to utilize their experience and publicly available information to gain advantages in their transactions through negotiating leverage.  That leverage is often directly correlated to the purchase and sale prices and the terms of the final transaction agreements, which in turn affect the amount of brokerage fees earned or commissions paid as part of the transactions.  Jetcraft's business success depends not only on the transaction economics, but also on the structure of the transactions and agreements, and the contractual terms and conditions negotiated amongst the parties.

6.     The agreements governing the purchase and sale of the aircraft are commonly known as aircraft purchase agreements ("APA").   During the negotiations of APAs, the parties and their advisors diligently negotiate the terms of the transaction, including the terms of the APA and related financing because those terms affect the ultimate economics of a transaction.  APA terms that are commonly negotiated, include, but are not limited to, the aircraft price; closing procedures; the down payment amounts, timing and method of payment; escrow requirements; representations and warranties made by the buyer and seller; the payment and

delivery schedules; pre-delivery inspection and acceptance rights; registration requirements; remedies for default or late payments; risk allocation devices, including with respect to regulatory changes; termination rights (including what remedies each party may seek in the event of termination); delivery location; governing law; assignability; terms of the warranty and of aftermarket support; training; and completion specifications.

7.     Jetcraft's customers also enlist Jetcraft and leverage its expertise to advise on the structure and terms for financing the aircraft acquisition. The terms of financing are heavily negotiated, including but not limited to escrow requirements; security interests and lien releases; principal and interest payment obligations and timing, which are closely correlated to the APA payment schedule; remedies upon default and default interest rates; credit enhancement mechanisms which may be or could be required by lenders, including guaranties, interest rate protection or post-default rights and remedies.

8.     As indicated above, giving Jetcraft's customers, suppliers, lenders and competitors, among others, public access to details such as sales price and the other contract terms identified above could significantly affect or impair Jetcraft's ability to fairly engage and protect its interests in future negotiations.  Jetcraft's potential customers (both sellers and purchasers of private aircraft) are likely to discover and leverage such confidential terms (including sales prices) to coerce Jetcraft into either walking away from a deal or accepting terms that it otherwise would not, essentially forcing Jetcraft to negotiate against itself based on prices and terms disclosed from other transactions.   The risk that disclosure of such confidential terms will disadvantage Jetcraft in future negotiations is magnified in this case given the highly-publicized nature of this case within the private aircraft industry.  In fact, since the filing of the initial Adversary Complaint in the Bankruptcy Court in September 2019, potential and existing customers have discussed the allegations

1 made against Jetcraft with Jetcraft personnel and competitors have tried to use such
2 allegations to harm Jetcraft in the market.

3    9.    It is for these reasons that the structure of these transactions, namely the
4 terms and conditions of each purchase or sale, and the prices at which Jetcraft
5 acquires or sells such aircraft, constitute highly confidential commercial
6 information. The public disclosure of the information described in this Declaration
7 would place Jetcraft at a marked disadvantage in negotiating with prospective
8 suppliers and purchasers, and it could also impair Jetcraft's ability to effectively
9 serve as a broker in other transactions. Namely, it would put Jetcraft entities at a
10 competitive disadvantage, allowing competing sellers of business aircraft to
11 assemble packages that are more attractive to potential purchasers.

12    10.    For the reasons set forth above, Jetcraft requires—as it did with the
13 APAs and related documents referenced in this Declaration—that all letters of intent,
14 APAs, related financing agreements, and ancillary transaction documents related
15 thereto, include strict confidentiality provisions or designations. Jetcraft takes steps
16 to limit access that those within Jetcraft have to its APAs, purchase price
17 information, and compensation/commission information.

18    **A.    Prices and Terms of APAs and Loan Agreements**

19    11.    The Appeal Decision identifies the prices at which Jetcraft bought or
20 sold Planes 1, 10 and 16, along with the amount of down payments Jetcraft required
21 buyer pay directly to Jetcraft (as opposed to in escrow). Appeal Decision at 13, 21,
22 and 26–28 (citing FAC ¶¶ 228, 230, 233, and 236 (purchase and re-sale price of
23 Plane 16); 344, 345, 350, and 355 (purchase and re-sale price of Plane 1); 191, 344,
24 345, 358, and 359 (purchase and re-sale price of Plane 10); and 123 and 127–28
25 (amount of deposits)).

26    12.    Similarly, the Appeal Decision also describes or quotes terms of the
27 Jetcraft APAs and a loan agreement of a Jetcraft affiliate. Appeal Decision at 12, 13,
28 20 and 85 (citing FAC ¶¶ 106, 123, 260, and 608 (APAs); and 183 (loan agreement)).

13.     As indicated above, Jetcraft's sale/purchase prices and the terms of the APAs constitute confidential commercial information that would put Jetcraft at a competitive disadvantage in competing with other aircraft brokers and in future negotiations with aircraft sellers and buyers. Moreover, these prices were included within APAs that each contained strict confidentiality provisions.

**B.     Side Letter Agreement and Repurchase Agreements**

14.     The Appeal Decision also references specific terms of a Side Letter Agreement between Jetcraft and Zetta PTE related to Plane 16. Appeal Decision at 26 (citing FAC ¶¶ 230).

15.     The existence of the Side Letter Agreement is not confidential. However, the specific terms constitute confidential commercial information because they relate to the core economic terms of the transaction involving Plane 16. Knowledge of such terms would give future counterparties negotiating leverage against Jetcraft as they could, for example, demand side letters with similar terms. As with the APAs, the Side Letter Agreement is subject to a strict confidentiality provision.

16.     The Appeal Decision also includes allegations describing the specific terms of Jetcraft's purported obligations under certain Repurchase Agreements between ECN and Jetcraft relating to Plane 1 and 10, in connection with securing financing for those aircraft, and terms of a loan agreement related to the initial purchase of Plane 1. Appeal Decision at 13, 21 (citing FAC ¶¶ 132 and 199).

17.     The existence of the Repurchase Agreements is not confidential, but the specific terms and conditions, along with the obligations created thereunder, constitute confidential, commercially sensitive information because if the details of the terms were disclosed publicly, Jetcraft would be unfairly disadvantaged in ongoing and future negotiations with lenders.  For example, future lenders might demand that Jetcraft agree to similar terms in future transactions before agreeing to finance a deal for a Jetcraft customer.

## C.   Profits and Commissions

18.   The Appeal Decision further discloses the specific amounts of profits Jetcraft made and the internal commissions it paid on Planes 1 and 10, along with the broker fee it earned on Plane 11. Appeal Decision at 13, 21 (citing FAC ¶¶ 130 and 197).

19.   The amount of profits generated, commissions paid, and fees earned constitute confidential and proprietary commercial information.   Providing competitors and counterparties access to profits and fees would give them a competitive advantage over Jetcraft, enabling competitors to undercut Jetcraft's prices or terms and providing counterparties leverage to negotiate reduced purchase prices, brokerage fees, or other favorable terms Jetcraft would not otherwise entertain. Moreover, the amounts paid in internal commissions (which Jetcraft believes is unique in the private aircraft market) could be used by competitors to attempt to poach Jetcraft's employees or agents, thus impairing Jetcraft's ability to retain those individuals.

20.   The risk of public disclosure and the harm described in this Declaration is significant. Therefore, if the items described above are not redacted, they will almost certainly become known to Jetcraft's current and potential customers, lenders, suppliers, and competitors, thus impairing Jetcraft's ability to fairly negotiate or compete with such parties.  In contrast, allowing for the information to be redacted will limit the risk of further harm.

DECLARATION OF PETER ANTONENKO

1       I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3       Executed on April 9, 2024 in Minneapolis, Minnesota.

4

5

6                       Peter Antonenko

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PETER ANTONENKO

# EXHIBIT D-2

TO DECLARATION OF ANDREW M. TROOP RE
PROPOSED REDACTIONS TO THE COURT'S
MARCH 26, 2024 MINUTES ORDER AND
PERCIPIENT WITNESS DECLARATIONS IN
SUPPORT THEREOF

KING & SPALDING LLP
Aaron Craig (Cal. Bar. No. 204741)
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Telephone: 213.443.4355

Michael Ciatti (admitted *pro hac vice*)
1700 Pennsylvania Ave., NW
2nd Floor
Washington, D.C. 20006-4707
Telephone: 202.737.0500

*Attorneys for Jetcraft Corporation, Jetcraft Global, Inc., Jetcoast 5000-5 LLC, Orion Aircraft Holdings Ltd., FK Group Ltd., FK Partners Limited and Jahid Fazal-Karim*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| **IN RE:**<br><br>ZETTA JET USA, INC., et al. | LA CV21-07572 JAK;<br>LA CV22-02004 JAK; and<br>LA CV22-06637 JAK<br><br><br>**DECLARATION OF JAHID FAZAL-KARIM IN SUPPORT OF REDACTION OF MARCH 26, 2024 APPEAL DECISION** |

I, Jahid Fazal-Karim, hereby declare under penalty of perjury as follows:

1.     I am over 18 years of age.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  This declaration is submitted in support of the redaction of certain information from the Court's March 26, 2004 Order Re Bankruptcy Appeals (21-7572 DKT. 1; 22-2004 DKT. 1; and 22-6637 DKT. 1) (the "Appeal Decision"). At the time of the transactions described in the Appeal Decision, I was a shareholder and Board member of Jetcraft Corporation.  I am currently the majority owner of Jetcraft UK, which is the sole owner of Jetcraft Corporation.  I am also the director and sole beneficial owner of FK Partners Ltd. and FK Group Ltd.  The FK entities have interests in a variety of different businesses including businesses that are not involved in the private aircraft sale or lease business.  I have worked most of my professional career in the global aircraft business.  From 1994 to 2001, I worked at Airbus in various roles including as Vice President of Business Development and Asset Management.  From approximately 2001 to 2008 I was employed by Bombardier in various roles including as Senior Vice President of Worldwide Sales.

2.     Jetcraft is in the business of aircraft sales, leasing, and related trade services.  It had been in existence for approximately 42 years before I purchased my first equity interests in 2008.  Jetcraft also provides consulting and management services in the private aircraft industry.  I am not an employee of Jetcraft, but I provide services to the company.  As part of that work, I help identify potential buyers and sellers of private aircraft.  At the time of the transactions discussed in the Appeal Decision, I had a contractual arrangement through my separate business, FK Partners, to be compensated for my work or role in completed aircraft transactions. That contractual relationship is now with FK Group.

3.     As explained herein, certain material included in the Appeal Decision constitutes confidential commercial information that I believe should be redacted from the publicly-filed Appeal Decision.

**My Commissions From Jetcraft and Bombardier**

4.     My primary compensation in my role as a broker in the private aircraft market is commissions I earn on aircraft purchase and sale transactions that I am involved in.

5.     For example, as noted above, Jetcraft compensates me through my separate businesses for the work I do in helping identify potential buyers and sellers of private aircraft.  I am also compensated on non-Jetcraft aircraft transactions that I am involved in.  In addition, I have acted as Bombardier's authorized representative for aircraft sales in Asia.  I received (or was entitled to receive) certain commissions on sales I made on Bombardier's behalf.

6.     The amounts of my commissions from both Jetcraft and Bombardier reflected in the Appeal Decision at pages 13, 15, 18, 19, 21, 24 (citing FAC ¶¶ 130, 148, 154, 179, 197, and 223) constitutes confidential commercial information for Jetcraft, the FK Entities, and Bombardier, respectively.

7.     If current or potential customers learn the commission amounts I charged to Jetcraft and Bombardier, they can use that information as potential leverage when negotiating with me for commissions on deals.  Moreover, I have competitors who also seek to act as brokers on private aircraft sales and, if they learn the amount of commissions I charged on these transactions, they can use that information to more effectively compete against me by offering to charge a lower commission.  This could result in me either losing customers or having to charge lower commissions.

8.     Moreover, my commissions from Bombardier were paid pursuant to written Sales Representative Agreements and my understanding is that Bombardier considers the amounts I was paid (or due to be paid) pursuant to these agreements to be confidential.

9.     In my experience, the amount of commission paid in connection with private aircraft sales is sensitive and guarded information in the competitive private

aircraft sales market.  As such, this type of information is not freely available to all competitors in the marketplace.  Accordingly, disclosure of my or my companies' information in this regard creates an unfair advantage for my competitors.

**Alleged Payment Spreadsheet**

10.   In one paragraph under header 11 on page 27, the Appeal Decision refers to a spreadsheet I sent to Khader Mattar. Appeal Decision at 27 (citing FAC ¶ 293). I emailed the spreadsheet to Mr. Mattar because he was confidentially thinking about leaving his position at Bombardier.  He had confided in me and, as a result, we were, on a confidential basis, considering going into business together in the Asian and Middle East aircraft market after he left Bombardier.  The purpose of sending Mr. Mattar the spreadsheet was to provide him with an estimate of the net profits/margins (not total commissions) that I had made on some previous aircraft transactions in the Asian and Middle East market in order for him to assess financial aspects of our potential joint business.  I understood that Mr. Mattar would maintain the information contained therein as confidential.

11.   The majority of the information discussed in the one paragraph under header 11 on page 27 of the Appeal Decision (citing FAC ¶ 293) that is based on the spreadsheet (and that we propose be redacted) contains an estimate of the net profit/margins (not total commissions) I made on the transactions involving certain clients/contacts.   The estimates of net profit/margin for each transaction are commercially sensitive to me and my business; public disclosure of this information could be detrimental to my business.  Disclosure of my estimate of net profits/margin can be used by current and potential clients to negotiate lower commission rates and can be used by competitors to try to take business from me by offering lower commissions.  As noted above, this type of information is not freely available or accessible for market participants and disclosure of my and my companies' information in this regard creates an unfair competitive disadvantage for me and my companies.  Thus, public disclosure of this information will negatively affect my

ability to keep existing customers, to gain new customers, and to negotiate commissions for aircraft sales with those customers.

12.     The first piece of information discussed in the paragraph under header 11 on page 27 of the Appeal Decision (citing FAC ¶ 293) that is based on the spreadsheet (and that we propose to redact) reflects money I transferred from my business accounts at either FK Partners or FK Group to a personal advisor who was assisting me with my financial affairs in Dubai at the time.  Customers could use the disclosure of the amounts of money I made in my business to argue for lower fees on future transactions, and competitors could use those amounts to lure clients away from me.  For this reason, these amounts of money are not merely personal and confidential financial information; they are confidential commercial information because they would grant both my future customers and my competitors a competitive advantage in their negotiations with me.

13.     Contrary to the allegations in the Amended Complaint that was the subject of the Appeal Decision, no portion of Exhibit 10 reflects or evidences payments made to either Mr. Mattar or any person employed by Bombardier.

14.     The risk of public disclosure and the harm described above is significant in this matter because the Zetta bankruptcies and the initial Adversary Complaint filed against me and my companies have received a great deal of attention from both current and  potential buyers and sellers of business aircraft.  Since the filing of the original Adversary Complaint, current and potential customers have discussed with me the defamatory allegations made against me and my companies.  Moreover, I am aware that my competitors have tried to use those defamatory allegations against me to harm me in the business aircraft market.  Therefore, if the items identified above are not redacted they will almost certainly become known to my current and potential customers and competitors and lead to the harm described

1  above.  In contrast, allowing for the information to be redacted will limit the risk of
2  that  harm.
3         I declare under penalty of perjury under the laws of the United States of
4  America that the foregoing is true and correct.
5
6
7         DATED: April 9, 2024         _____
8                                                      Jahid Fazal-Karim
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

DECLARATION OF JAHID FAZAL-KARIM